Gomila and others *v.* Culliford and another.[1]

(*District Court, E. D. Louisiana.* June 4, 1884.)

1. Admiralty—Liability of Claimants—Admiralty Rule, No. 2.
    Where two parties appear and claim to be the owners of a vessel arrested under an admiralty warrant of arrest, containing the attachment clause, according to admiralty rule No. 2, and give a joint bond for her release, one of them cannot avoid liability by afterwards pleading that he was not an owner.

2. Same—Contracts.
    When a contract is silent as to time of performance, and performance is tendered, without reservation, which is admitted to be defective, and the obligee acts irreparably upon such admitted non-performance, the contract is violated and damages result.

3. Same—Charter-Party.
    Where, under a contract of charter-party to furnish a vessel of a certain capacity, a vessel is tendered which, after loading, is admitted to be of less than the guarantied capacity and is declined and the charterer suffers loss, he is entitled to recover damages.

[1] Reported by Joseph P. Hornor, Esq , of the New Orleans bar.

In Admiralty.

*J. Ward Gurley, Jr., John D. Rouse,* and *Wm. Grant,* for libelants.

*James McConnell* and *James R. Beckwith,* for respondents.

BILLINGS, J. This is an action for damages for the breach of a charter-party, brought by the charterers against the owners. On June 19, 1883, Gomila & Co., the libelants, chartered the steamer Deronda. The charterers were to load the vessel. She was guarantied to carry not less than 10,000 quarters of corn, of 480 pounds. The loading was commenced on June 28th. On June 30th the vessel was declared by the inspectors to be full. She then contained 9,635 quarters, *i. e.,* 365 quarters less than the guarantied quantity. Upon the communication of this fact to the libelants, and by them to the parties with whom they had a contract to fill which the charter of the Deronda was entered into, they refused to accept of the delivery of the amount of 9,635 quarters, their contract being for not less than 10,000 quarters, and not more than 12,000 quarters. A settlement was made with these purchasers by libelants by the payment of some $3,100. Negotiations were entered into between libelants and respondents—*First,* to have the respondents take the cargo at the price at which the libelants had contracted to sell, and afterwards to adjust the damages by fixing the value of the grain laden by what could be obtained by offer at private sale from other European parties, and no agreement as to the damages could be effected. Corn had declined, and after advertising the sale in the two leading morning New Orleans newspapers, in one for five days and in the other for three days, and in one of the evening newspapers for three days, the cargo was, on July 7th, sold at public auction by an auctioneer at a price which would be ——— per quarter. On the sixth of July De Wolf & Hammond, as agents of the owners of the Deronda, protested against the sale at auction as advertised, both to the libelants and their purchasers, E. Forestier & Co., through a notary public, and with the two witnesses required by the statute of the state of Louisiana. On the following day, July 7th, through the same formality, the captain of the Deronda and De Wolf & Hammond, agents, in behalf of the owners, gave a notice both to the libelants, as charterers, and E. Forestier & Co., transferees, that the said vessel would on that day, at 10 o'clock A. M., be ready to receive "the balance of the said cargo as per charter-party." On July 13th, the sale at auction having taken place and the remainder of the cargo having been furnished by the purchasers at the auction sale, the Deronda received the remaining 367 quarters, making the quantity guarantied, namely, 10,000 quarters, her coal bunks having meanwhile been taken out and other space having been furnished by the representatives of the vessel; and with the cargo she sailed to the port of delivery mentioned in the charter-party, where she delivered the same.

There are two matters, which relate (1) to the manner in which the action is brought, and (2) to the effect of what was done as to trans-

ferring the charter-party to Forestier & Co., which have been set out fully in the answer of respondents, and have been strongly urged in the argument by their proctors, which I will now consider.

1. It is urged that the real and sole owner of the Deronda was Mr. Culliford, one of the defendants' firm, and not Culliford & Clark, against whom jointly this suit is brought. It is not necessary to consider what effect should be given to such a defense presented in an answer where it appears that the suit was commenced and jurisdiction acquired by a seizure of the Deronda under a warrant of arrest containing the attachment clause according to admiralty rule No. 2, and that the attachment was dissolved by the defendants appearing in the cause and giving their joint bond or stipulation, and filing their joint answer upon the merits, pleading performance of an alleged contract. If the defense could be allowed to avail at all, it would be only to cause judgment to go against the defendant Culliford alone. But upon the merits I think the court must find against both defendants, upon the ground that they held themselves out as owners for the purpose of making this charter-party, and as owners subsequently ratified the charter made by De Wolf & Hammond as agents of the owners. See telegram A 17 from Culliford to his firm, dated June 18, 1882, and letter from Culliford & Clark to Hammond, June 19th, and letters from defendants to plaintiffs, dated June 23d, and marked A No. 20 and A No. 21. It does not appear how the vessel was connected with defendants' business, but the whole evidence with reference to the transaction shows that the charter-party was executed by De Wolf & Hammond as agents for, and for the benefit of and under the direction of, the defendant's firm as owners. As in case of a question as to liability as a partner, the holding out may create the liability independently of the fact of ownership. It operates as an estoppel. The holding out of themselves as owners by Culliford & Clark is abundantly established.

2. As to the transfer there is no conflict in the testimony. The charter-party was executed to the libelants, who were willing to substitute E. Forestier & Co. in case the guaranty was complied with, but who objected to any such substitution before it was ascertained whether the guaranty would be fulfilled. De Wolf and the representative of Forestier & Co. made the cancellation. It is agreed to by all that Gomila never assented to it. It was possible in law and necessary for Gomila & Co. to retain their contract rights as charterers, with the defendants, of the Deronda, while they also designated her as the vessel which should receive the 10,000 quarters of grain from E. Forestier & Co. under the contract of June 7th, (marked "Bengston No. 1.") The market had fallen, and they must place themselves in such a position that they could fulfill the contract with Forestier and still hold the defendants to their guaranty. Had this obligation of guaranty been transferred to Forestier & Co., upon the default under it Gomila & Co. might have lost the sale of the 10,-

000 quarters of grain at 28s. 3d. The motive for Gomila & Co. not consenting to cancel is manifest, and the testimony of both Gomila and Bengston and Forestier is concurrent that they did not consent. Indeed, the protests made by the defendants through their captain and agents, two upon July 6th and one upon July 7th, marked "B, Nos. 2, 3, and 4," are inconsistent with the idea that the original charter-party had been canceled and another substituted in its stead. Gomila & Co. are, in those documents, treated as retaining their rights under the charter-party, with a designation of Forestier & Co. as parties who, under them, were to accept a fulfillment of the contract of purchase from them by means of it. There is but one charter-party referred to, and the firm of Forestier & Co. are spoken of as "transferees." So, too, the negotiation and correspondence and telegrams, as to an adjustment of the loss after the vessel was thought to be fully loaded, recognize Gomila & Co., the charterers, as being the persons who still hold all their rights under the guaranty. Indeed, all the evidence confirms Gomila and Bengston, and the so-called cancellation was effected without the assent, and with the expressed dissent, of Gomila & Co., and therefore their rights under the charter-party and guaranty have not been annulled, and remain in full force.

Upon the merits, the first question to be considered is, was there a breach in the undertaking of the owners whereby they guarantied that the Deronda would carry 10,000 quarters of grain?

It has been urged with great force that inasmuch as the representatives of the owners of the Deronda knew that the charter-party was entered into by Gomila & Co., the libelants, in order to carry out their contract to furnish a shipment in the month of June, this fact should control or influence the interpretation of the charter-party as to the time of performance. On the other hand, the respondents, with equal earnestness, urge that when a contract is silent as to the time of performance, the only qualification or limitation which the law will infer or supply is that the time of performance shall be reasonable. It is possible that these two propositions might, as applied to this case, be harmonious, for in determining what was reasonable, regard must be had not alone to the subject-matter of the contract, but the extrinsic circumstances, and among these would be the known object of the contract, and I think that the inquiry as to the exact carrying capacity of the Deronda, the insertion into the contract of the guaranty on that subject, and the negotiation as to the time of the commencement of the loading and the manner in which it was to be done, conclusively establish that the charter-party was avowed by the charterers and recognized by the agents of the owners as being the means of fulfilling a prior contract. In order to reach a decision of the case it is not necessary to consider the question of interpretation as a separate inquiry, but rather to apply the established facts to the matter of attempted performance, and admitted inability to perform. There

can be no doubt but that if it appears that after an attempt to load the Deronda with 10,000 quarters of grain, in accordance with the guaranty, the owners admitted, without reservation, their ability to place in her no more than 9,635 quarters, and notified Gomila & Co. of that fact; that in consequence of such unreserved admission and notification Gomila & Co. were induced to abandon their sale to E. Forestier & Co., thereby retaining on their hands the grain, with the market price so conditioned that a heavy loss ensued,—it would not be possible for the owners afterwards to revive the charter-party, except upon the condition of being responsible for such loss. This is just what the evidence shows. And the principle of law which is to be controlling is not one exclusively of interpretation, but that when a contract is silent as to time of performance, and performance is tendered without reservation, which is admitted to be defective, and the obligee acts irreparably upon such admitted non-performance, the contract is violated and damages result.

This is well settled as the law of Louisiana. The reason given by the court in numerous cases is that a putting in default would have been a vain thing. In *Cable* v. *Leeds*, 6 La. Ann. 293, the 'court held that where a merchant agrees to make and deliver a piece of machinery as soon as possible, and actually does deliver the machinery, but so defective that it will not answer the purpose intended, "he put himself into an irretrievable default, which superseded the necessity of being put into default by the other party." The same question is dealt with in *Knight* v. *Heinnes*, 9 Rob. 377, where the court says, (p. 379,) the defendant's acknowledged inability to comply with his contract, rendered it unnecessary for the plaintiff to put him regularly in default. See, also, *Nicholson* v. *Desobry*, 14 La. Ann. 81.

As to whether, in point of fact, there was this acknowledged inability to load the stipulated amount of grain, I shall derive the evidence from the correspondence and telegrams which passed between the defendants and their agents.

On June 30th the agents of the defendants telegraphed to the defendants as follows:

"June 30th. *To Culliford & Clark, Sunderland:* Deronda loaded; carries 9,635 quarters. Cargo sold, not less than ten thousand quarters. Copenhagen, twenty-eight, three; present value, twenty-five. Buyers refuse acceptance, as cargo falls short. Charterers hold ship responsible. Advise.
    [Signed]                                "DE WOLF & HAMMOND."

Under date of July 5th, the defendants having answered by telegram, also replied by letter, as follows:

"A No. 22.

"(Copy.)                                SUNDERLAND, 5th July, 1883.

"*Messrs. De Wolf & Hammond, New Orleans*—DEAR SIRS: We received your cable on Sunday, informing us that the Deronda had loaded 9,635 quarters, and the cargo sold not less than 10,000 quarters @ 28s. 3d.; present value 25s.; buyers refuse acceptance, as cargo falls short; charterers hold ship

responsible. In reply to this, we cabled at once for you to compromise the claim and pay the difference of 3s. 3d. per quarter, as between the quantity stated to be shipped and the 10,000 quarters. We were astonished on Tuesday to find, on receipt of your cable, "charterers trying to resell cargo," that you had evidently misconstrued the purport of our message; but how this could be done by any sane person into meaning that we were willing to pay the difference of 3s. 3d. per quarter upon the whole cargo we are at a loss to understand, and can only come to the conclusion that such a meaning of our cable has been construed purposely. How a business man, supposed so be acting on behalf of an owner, could think that, when a difficulty like the present arose, he (the owner) should right off agree to give up more than half his total freight on such a voyage, is too much even for any stretch of imagination, and if our interests can only be protected in the way you have managed this business, the less we place in your hands the better. In the beginning of the negotiations for the charter of this ship there was a considerable mull, at which we expressed ourselves pretty strongly to your Mr. Hammond when in Liverpool, and when you offered us this freight we accepted it, subject to the captain being satisfied he could carry the requisite quantity, and your cable of the nineteenth ult. distinctly told us she could carry about 10,000 quarters, from which we concluded you had consulted with the captain; in fact, his letter informs us you had seen him with our cable; but we must call your attention to the fact that in the same cable you informed us about 10,000 quarters, and how you could insert in the charter not less than 10,000 quarters, we are at a loss to comprehend.

"While writing, your reply has come that you were consulting McConnell and trying to arrange, but no mention about the ship's sailing; we therefore cabled you why the delay to give bail and get the ship away. We are at a loss to understand why the ship should be detained during these negotiations. The whole business is sickening. If you had understood your business at all you would have dispatched and settled the question after she had left; but how you have allowed the charterer to detain the ship in the way he has done we have yet to learn; but we certainly can come to no other conclusion than that you have grossly neglected our interest. Yours, truly,

"CULLIFORD & CLARK."

Under date of August 13th the defendants give a *resume* of the events attending the tender of the vessel, as follows:

"A No. 25.

"SUNDERLAND, 13th August, 1883.

*"Messrs. De Wolf & Hammond, New Orleans:*

'DERONDA.'

"DEAR SIRS: Your letters regarding this wretched business have all been received and well noted, but, we regret to say, they do not much alter our opinion of the manner in which this case has been handled by you. The captain's protest, although probably correct, is about as weak a document as we ever read, unless your object was to disclose our hand, and so strengthen that of the parties taking the action against the ship. Will you tell us why you and the captain rushed away to Gomila as soon as it was found the ship had not taken the guarantied quantity? What other position could you possibly expect him to take than holding the ship responsible for a breach of the charter? Both you and the captain knew the ship was guarantied to carry 10,000 quarters, and also knew there was no guaranty as to the time of shipment. With these two facts will you tell us why the ship was allowed to be so hurriedly loaded, and why it did not dawn upon you at once to take bunkers out, (which should never have been put in?) In running away to Gomila

you really played into his hands. If our captain was not competent for such a matter as this we would have thought ordinary common sense would have told you that care must be taken to get the guarantied quantity into the ship, and, to do this, how did you proceed actually, with the doubt in your minds about the ship carrying the quantity? You allow her to coal for Sydney; ordinary caution for our interest should have prevented this, and told you the ship must coal for Newport News."

This correspondence, coming from the defendants themselves, shows that it was admitted that the vessel could only carry 9,635 quarters, when that amount had been placed on board, and that, as having that limit in her capacity, she was without reservation tendered to the plaintiffs under the charter-party. These facts bring the case within the principle of the cases above cited, and establish a violation of the guaranty of the defendants that the Deronda would carry 10,000 quarters of grain.

The remaining question is as to the amount of recoverable damages which have been shown. The amount of damages would be the difference between the contract price and the market price, June 30th, the date of the defendants' admission of their inability to perform the contract, whereby the plaintiffs lost their opportunity of selling to Forestier & Co. The corn was laden on board, and the quantity was so great that it would be difficult to find a purchaser except in connection with the charter-party. Of course, the auction price is evidence of value. Where the thing could naturally be bought and sold at auction, the price is high evidence of value. Considering the peculiar situation of this property,—10,000 quarters of grain, laden on board a vessel,—and the increased price which it was reasonably possible the grain would bring if sold in connection with the charter-party, I think, as *gestor negotiorum*, the libelant was justified in incurring the expense of an advertisement and attempted sale at auction; though I think he was not justified in permitting a sale at lower terms than the evidence shows were the ruling terms. The difference between the contract price and the market price appears clearly in the telegram of De Wolf & Hammond to the defendants, dated June 30th, which is translated and fully assented to in the reply by letter of defendants, under date of July 5th. They say the price of cargo, 28s. 3d., present value 25s., making a difference of 3s. 3d. per quarter. To this must be added 3d. per quarter, the difference between the allowed freight (which, if diminished, was to be for account of seller) in the contract of sale with Forestier, and the rate fixed by the charter-party,—6s. and 5s. 9d.,—in all 3s. 6d. per quarter, which would make the loss $8,426.25. To this should be added the charges which were paid the auctioneer for advertisement and fees, $934.72, making a total of $9,360.97, for which amount, with interest from June 30, 1883, libelants must have judgment.